UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

**GOVERNMENT EMPLOYEES INSURANCE COMPANY**, *et al.*

Plaintiffs,

– against –

**SMK PHARMACY CORP**, *et al.*

Defendant.

------------------------------------------------------------ X

**MEMORANDUM DECISION AND ORDER**

21-CV-3247 (AMD) (RLM)

**ANN M. DONNELLY**, United States District Judge:

On April 20, 2020, the plaintiffs filed a complaint accusing the defendants of submitting fraudulent insurance claims for expensive, medically unnecessary topical pain products prescribed to people with soft tissue injuries, whom the plaintiffs insured. The defendants filed approximately 467 individual arbitrations through the American Arbitration Association and 48 individual lawsuits in New York state courts to collect on the same claims. Many of those actions are pending. On December 13, 2021, the plaintiffs moved to stay the arbitrations and enjoin the defendants from bringing any new arbitrations or lawsuits. For the reasons below, I grant the plaintiffs' motion.

## BACKGROUND[1]

Beginning in 2017, the defendants allegedly participated in a scheme to submit fraudulent insurance claims for expensive topical pain products purportedly provided to patients involved in

---

[1] A court may consider "the entire record including affidavits and other hearsay evidence" when deciding a preliminary injunction motion. *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003)); *see also 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 455 (S.D.N.Y. 2019) (explaining that courts in this circuit "'routinely consider hearsay evidence' . . . including affidavits,

automobile accidents. (ECF No. 1 ¶¶ 55-64.) In furtherance of the alleged scheme, the defendants—a Queens pharmacy and its owners—paid kickbacks and other financial incentives to a network of No-Fault clinic controllers and prescribing providers, who in return directed patients insured by the plaintiffs to fill medically unnecessary prescriptions for the expensive products at the defendants' pharmacy. (*Id.* ¶¶ 55-59.) To date, the defendants' pharmacy has submitted over 12,000 allegedly fraudulent charges related to these medically unnecessary products, totaling over $4,023,200, of which $1,926,600 has not yet been paid. (*Id.* ¶ 1; ECF No. 1-3.)

The plaintiffs seek a declaratory judgment that they do not have to pay the defendants for the pharmacy's pending claims, as well as money damages for violating civil RICO under 18 U.S.C. § 1962, common law fraud and unjust enrichment. (ECF No. 1 ¶¶ 247-75.)

## I. Medically Unnecessary Products[2]

The topical pain products at issue—compound creams, diclofenac sodium products and lidocaine products—have extremely expensive "average wholesale prices," which the defendants used to inflate their pharmacy's billing and maximize their profits. (*Id.* ¶ 230.)[3] The defendants worked with No-Fault clinics, whose prescribing providers wrote prescriptions to the insureds for the products, and directed the insureds to go to the defendants' pharmacy to fill their prescriptions. The insureds were involved in minor motor vehicle accidents and, according to a

depositions, and sworn testimony." (quoting *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010))).

[2] The plaintiffs provide a representative sample of 12,929 allegedly fraudulent claims. (*See* ECF No. 1-3.) The sample lists the claims by the defendants' pharmacy, as well as the claim numbers, approximate mailing dates, billing codes and charges. (*Id.*) The plaintiffs also include examples of the fraudulent prescriptions (ECF No. 1-4), claim forms and patient histories for a sample of insureds. (ECF No. 36-5.)

[3] The plaintiffs allege that the defendants never submitted wholesale purchase invoices stating how much they actually paid for the ingredients in these products, and that the defendants never paid the wholesale price or actually purchased these ingredients to begin with. (ECF No. 1 ¶ 233-34.)

physician who reviewed patient records for the plaintiffs, the overwhelming majority sustained "ordinary soft tissue injuries, such as strains and sprains" particularly in their necks and backs. (ECF No. 30-4 ¶¶ 5-9.)[4]

The physician also concluded that the defendants "systematically and excessively" dispensed these products in large volumes "without regard to the needs of the patients." (ECF No. 30-4 ¶ 10.) For example, the patients' examination reports did not document "whether oral medications were contraindicated," "the reasons why the topical pain products prescribed were medically necessary," "whether the topical pain products prescribed to a particular patient were used," and "whether the topical pain products provided any pain relief to the patient or were otherwise effective." (*Id.* ¶ 14.) The physician concluded that prescribing these products "represents a gross deviation from the standard of care," and that the products' prescription and dispensation "revealed a pattern . . . designed to exploit the patients for financial gain." (*Id.* ¶ 10.)

**a. Compound Creams[5]**

The defendants targeted compound cream, which is a combination of expensive ingredients compounded to create an "exorbitantly priced" cream—primarily in the form of "DCLTM"[6] cream—that could generate huge revenues from billing. (*Id.* ¶¶ 110, 150.) A single tube of the cream typically cost between $803.99 and $855.26 (*id.* ¶¶ 91, 92, 102), even though

[4] The list of the claims the physician reviewed is included with the plaintiffs' briefing on this motion. (ECF No. 36-2.)

[5] The plaintiffs list 15 examples in which creams were allegedly prescribed and dispensed even though they were medically unnecessary. (*See* ECF No. 1 ¶ 149.) Each example includes the patient's initials, the physician's full name, the relevant dates, the patient's injuries and the products prescribed. (*Id.*)

[6] "DCLTM" is an acronym for the cream's ingredients: diclofenac, cyclobenzaprine, lidocaine, tetracaine and menthol. (*See* ECF No. 1 ¶ 111.)

commercially available medications with proven therapeutic effects were significantly cheaper. (*Id.* ¶ 103.)

The purpose of compounding is to customize a medication for a patient's individualized needs. But here, the defendants allegedly created predetermined compound creams—often DCTLM cream—that they could produce in bulk. (*Id.* ¶¶ 115, 118-20, 151, 154.) In addition, the defendants' DCTLM cream used lidocaine and tetracaine, which are functionally duplicative and medically unnecessary. (*Id.* ¶ 17.) The defendants gave prescribing providers rubber stamps and preprinted labels that listed DCTLM's ingredients and percentage concentrations. (*Id.* ¶¶ 94-97.)[7]

Moreover, compound creams are a last resort, to be used after a physician concludes that a patient could not tolerate oral medications, or that the oral medications were ineffective or contraindicated, and after trying other FDA-approved topical products. (*Id.* ¶ 133.) However, in this case, the insureds' medical records did not detail their medical history, which would have reflected the steps that doctors took before they prescribed a compound cream, as well as whether the patients could tolerate regular medications, and whether the medications were ineffective or contraindicated. (*Id.* ¶¶ 70-72, 76-81.) Nor did the records document whether the patient used the compound cream, or whether it provided any relief. (*Id.*) The prescribing providers produced boilerplate examination reports that omitted any mention of individualized treatment. (*Id.*) The prescribing providers also issued months' worth of compound cream prescriptions to the insureds—almost all of whom had soft tissue injuries that typically resolved after a short course of conservative treatment, or no treatment at all—even though there was no medical evidentiary support that these creams should be used for these kinds of injuries. (*Id.*

[7] The plaintiffs provide 10 examples of preprinted labels or stamps for compound cream. (*See* ECF No. 1-4.)

¶¶ 134-36, 143-44.)[8] Prescribing providers also recommended that patients take oral pain products with these creams, which was essentially duplicative and created health risks. (*Id.* ¶¶ 96-97.)

**b. Diclofenac Sodium and Lidocaine[9]**

The defendants targeted other allegedly medically unnecessary topical pain products, particularly two that used the ingredients diclofenac sodium and lidocaine. Like the compound creams, products with diclofenac sodium and lidocaine were expensive. A tube of diclofenac sodium gel cost between $909.89 and $948.59; a bottle of diclofenac sodium solution cost between $212.59 and $1,108.69 (*id.* ¶¶ 178-79); lidocaine ointment cost between $308.49 and $613.89; and lidocaine patches cost between $229.69 and $903.59. (*Id.* ¶ 200.) As with the compound creams, there were commercially available alternatives to diclofenac sodium and lidocaine products that were significantly cheaper. (*Id.* ¶¶ 175, 190-91.)

The plaintiffs argue that these topical pain products were also medically unnecessary. According to the plaintiffs, neither diclofenac sodium nor lidocaine was typically used to treat deep musculoskeletal pain; diclofenac sodium gel was used for treating actinic keratosis, diclofenac sodium solution for osteoarthritis joint pain (*id.* ¶¶ 160-64), and lidocaine for minor burns and skin irritations. (*Id.* ¶¶ 183-84.) Nevertheless, these products were prescribed to

---

[8] In a declaration, one of the defendants' physicians represented that he prescribed compound creams "for on-site alleviation of my patient's pain, to assist in performing physical therapy exercises and accelerate recovery" (ECF No. 34-3 ¶ 26), but noted that compound creams "will often follow unsuccessful conservative treatment," and "[a]s such prescriptions are uncommon in my practice, they are prescribed specifically for a particular patient, based on their condition." (*Id.* ¶¶ 27-28.) The plaintiffs dispute the accuracy of these statements, citing the physician's allegedly rubber-stamped prescriptions (*see* ECF No. 36-3), as well as the plaintiffs' own expert's contrary conclusions. (*See* ECF No. 36-1 ¶¶ 4-9.)

[9] The plaintiffs list 10 examples of cases in which diclofenac sodium products were allegedly prescribed and dispensed, and another 10 examples in which lidocaine products were allegedly prescribed and dispensed, even though they were medically unnecessary. (*See* ECF No. 1 ¶¶ 173, 198.) Each example includes the patient's initials, the physician's full name, the relevant dates, the patient's injuries and the products prescribed. (*Id.*)

insureds who generally did not suffer from these conditions; they had minor injuries—sprains and strains from motor vehicle accidents. (*Id.* ¶¶ 160-64, 192-95.) Moreover, prescribing providers also often prescribed heating pads, which were contraindicated with lidocaine patches. (*Id.* ¶ 197.)[10]

**II. Fraudulent Scheme**

To drive their fraudulent billing scheme, the defendants allegedly colluded with No-Fault clinic controllers and providers to issue prescriptions for the products listed above, and to ensure that the insureds filled their prescriptions at the defendants' pharmacy, even if other pharmacies were much closer and more convenient for the insureds or the providers. (*Id.* ¶ 209.) The plaintiffs allege that the clinic controllers and prescribing providers had no legitimate reason to direct prescriptions to the defendants' pharmacy instead of other pharmacies, and that without kickbacks and other financial incentives, the prescribing providers would not have prescribed the products at issue or sent the patients to the defendants' pharmacy. (*Id.* ¶¶ 209, 216-18.) Consequently, the defendants submitted fraudulent insurance claim forms that falsely represented that the products they dispensed were medically necessary and intended for genuine care, when they were not. (*Id.* ¶¶ 236-37.)

Additionally, the plaintiffs claim that the defendants violated state and federal compounding laws because they created their compound creams in bulk, without the required licensure by state authorities (*id.* ¶¶ 34-42), or compliance with state and federal regulation governing bulk compounding. (*Id.* ¶¶ 34-54, 124-27.) Consequently, the defendants' pharmacy

[10] The defendants' physician represents that he prescribed topical medications with diclofenac sodium because they were "highly effective in treating pain," as well as lidocaine because it provides "effective peripheral analgesia for localized pain associated with joint and low back ailments." (ECF No. 34-3 ¶¶ 14-18, 22-23.)

was ineligible to receive reimbursement for No-Fault benefits, which conditions reimbursement on compliance with state laws. (*Id.* ¶¶ 30-33, 237.)

**III. Procedural History**

The defendants sought to collect on their allegedly fraudulent billing by initiating approximately 467 individual collection arbitrations through the American Arbitration Association, as well as approximately 48 collection lawsuits in New York state court. (ECF No. 30-3 ¶ 7.) The defendants currently seek more than $485,000 through the arbitrations, and more than $45,000 through the lawsuits. (*Id.*) The plaintiffs, in defending against these collection proceedings, have raised defenses including that each prescription lacked medical necessity. (ECF No. 36-6 at 9 n.3.) To date, some of the arbitrators have ruled for the plaintiffs, while others have ruled for the defendants. (ECF Nos. 34-4, 34-5, 34-6, 34-7, 34-8, 34-9, 34-10, 34-11, 34-12 and 34-13.)

On June 8, 2021, the plaintiffs filed a complaint in this Court (ECF No. 1), and on October 8, 2021, the defendants moved to dismiss the action. (ECF No. 24.) On December 13, 2021, the plaintiffs filed a motion to stay the underlying collection arbitrations, and to enjoin the defendants from filing new collection arbitrations and lawsuits. (ECF Nos. 30 and 36.)

**LEGAL STANDARD**

Courts in this district apply the preliminary injunction standard when a party seeks to stay pending No-Fault insurance claims and enjoin the filing of further claims. *GEICO v. Beynin*, No. 19-CV-6118, 2021 WL 1146051, at *4 (E.D.N.Y. Mar. 25, 2021) (collecting cases). A preliminary injunction is "an extraordinary remedy never awarded as of right," *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and is intended to "preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395

(1981)). A decision to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395.

In this circuit, a party seeking a preliminary injunction must establish: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Beynin*, 2021 WL 1146051, at *4 (quoting *Trump v. Vance*, 941 F.3d 631, 639 (2d Cir. 2019)). Motions for preliminary injunctions "should not be resolved on the basis of affidavits that evince disputed issues of fact." *Davis v. N.Y.C. Hous. Auth.*, 166 F.3d 432, 437-48 (2d Cir. 1999).[11]

## DISCUSSION

### I. Irreparable Harm

The plaintiffs argue that the risk of inconsistent judgments in the various pending collection proceedings establishes irreparable harm, and that it wastes time and resources to participate in these arbitrations if the awards are eventually determined to be inconsistent with this Court's declaratory judgment. (*See* ECF No. 30-1 at 15-18; ECF No. 36-6 at 7-11.) The defendants respond that spending money, time and energy litigating these proceedings is not enough to establish irreparable harm, and any inconsistencies between an award and this Court's

[11] The defendants argue that the plaintiffs' motion is based "entirely upon supposition and unsworn documents." (ECF No. 34-16 at 7.) But the plaintiffs identify numerous examples in which the defendants dispensed medically unnecessary products, and include documentary support. In any event, a court deciding a motion for a preliminary injunction may consider "the entire record." *Optumrx*, 152 F. Supp. 3d at 132; *see also Gov't Emps. Ins. Co. v. Cean*, No. 19-CV-2363, 2019 WL 6253804, at *5 (E.D.N.Y. Nov. 22, 2019) (finding a serious question going to the merits of the case where plaintiffs "alleged, in significant detail, facts relating to Defendants' fraudulent activity in its Complaint, describing fraudulent medical treatment, deceitful billing protocols, and an illegal kickback and referral scheme").

declaratory judgment does not matter because the plaintiffs would be made financially whole were they to succeed on their RICO and fraud claims. (*See* ECF No. 34-16 at 15-26.)

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)). "To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 449 (E.D.N.Y. 2020) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)) (internal quotation marks omitted). The harm must be "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

Courts in this district have routinely found that the risk of inconsistencies between arbitrations and a court's ruling establishes irreparable harm. *See Wellmart*, 435 F. Supp. 3d at 450 (collecting cases); *see also Gov't Emps. Ins. Co. v. Relief Med., P.C.*, No. 20-CV-2165, 2021 WL 3565739, at *12 (E.D.N.Y. Aug. 12, 2021). This includes cases in which "an insurer alleges a risk of inconsistent judgments in No-Fault arbitrations and RICO- and fraud-based litigation in federal court," *Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab'y, LLC*, No. 20-CV-2391, 2020 WL 7042648, at *4 (E.D.N.Y. Dec. 1, 2020) (collecting cases), because an insurer would "waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action." *Gov't Emps. Ins. Co. v.*

*Zaitsev*, No. 1:20-CV-03495, 2021 WL 3173171, at *2 (E.D.N.Y. July 27, 2021) (quoting *Gov't Emps. Ins. Co. v. Moshe*, No. 12-CV-1098, 2020 WL 3503176, at *1 (E.D.N.Y. June 29, 2020)).

The plaintiffs allege a No-Fault insurance fraud scheme in which the defendants submitted medically unnecessary claims for reimbursement; the plaintiffs also face numerous arbitration proceedings initiated by the defendants based on the same claims. The plaintiffs support their allegations with specifics: 15 examples of insureds getting medically unnecessary compound creams, 10 prescriptions with preprinted labels or stamps for the compound creams, 10 times where insureds were given medically unnecessary diclofenac sodium products, 10 times where insureds were given medically unnecessary lidocaine products, and a physician's declaration, based on his review of 50 insureds' medical records, that the defendants systematically dispensed these products without regard to the insureds' medical needs.

Meanwhile, the defendants have brought 467 individual collection arbitrations through the American Arbitration Association, as well as approximately 48 individual collection lawsuits in New York state court, many of which are pending, and all of which involve the subject of this action's declaratory judgment claim. The plaintiffs' defenses in the arbitrations, as well as their request for declaratory judgment in this action, hinge in part on the lack of medical necessity for the pharmacy's charges. Given the risk of inconsistency between the arbitrations and a declaratory judgment by this Court, the plaintiffs have established irreparable harm. *See Cean*, 2019 WL 6253804, at *5 (finding irreparable harm when "an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action"); *Zaitsev*, 2021 WL 3173171, at *2 ("Defendants have at least 821 pending arbitrations against GEICO that present a risk of inconsistent

judgments. This establishes irreparable harm."); *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 233 (E.D.N.Y. 2018).

The defendants' reliance on *Allstate Insurance Co. v. Harvey Fam. Chiropractic* is misplaced. In that case, the Second Circuit reaffirmed that "mere injuries . . . in terms of money, time and energy necessarily expended" in collection proceedings absent a stay "are not enough to establish irreparable harm." *Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017) (internal quotation marks omitted). However, *Harvey* "does not address the risk of inconsistent judgments."[12] *Relief Med.*, 2021 WL 3565739, at *11; *see also Wellmart*, 435 F. Supp. 3d at 451 (observing the same); *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 17-CV-2802, 2018 WL 6031156, at *5 (E.D.N.Y. Nov. 16, 2018) (observing the same).

Nor does *Allstate Ins. Co. v. Avetisyan*, 2018 WL 6344249 (E.D.N.Y. Oct. 30, 2018) support the defendants' position. There, the pending claims in the arbitration proceedings "were different from the claims alleged as fraudulent" in the case before the court. *Moshe*, 2020 WL 3503176, at *2 n.3. In this case, the plaintiffs' defenses in arbitration and the declaratory judgment that they seek are the same: whether products that the defendants dispensed were medically necessary for the insureds. The defendants also cite two unpublished decisions, *Allstate Ins. Co. v. Zelefsky*, No. 13-CV-5830 (E.D.N.Y. April 2, 2014) and *Allstate Ins. Co. v. Eastern Island Medical Care*, No. 16-CV-2802 (E.D.N.Y. June 5, 2017), but neither decision explains the basis for finding that there was no irreparable harm. *See Wellmart*, 435 F. Supp. 3d at 452 ("The court is unable to discern the specific basis for Judge Bianco's conclusion that

---

[12] The defendants maintain that *Harvey* "disposes of 'inconsistent outcomes.'" (*See* ECF No. 34-16 at 22 (citing *Harvey*, 677 F. App'x at 718 ("Even if the defendants obtain other No-Fault reimbursements in state court and arbitrations while this case is pending, the plaintiffs are free to recover those payments should they prevail on their RICO claim.")).) But the *Harvey* court addressed only whether the plaintiffs could be "fully compensated through money damages suffered from the defendants' fraudulent claims." *Harvey*, 677 F. App'x at 718.

Allstate was not at risk of irreparable harm, and thus, the *Zelefsky* and *Eastern Island* decisions do not color this court's analysis.").[13]

## II. "Serious Questions" Standard

The plaintiffs argue that the complaint, along with their examples and exhibits, establishes a likelihood that the defendants engaged in a fraudulent scheme to bill for medically unnecessary products, and at a minimum, that there are sufficiently serious questions going to the merits of the case. (ECF No. 30-1 at 19-24; ECF No. 36-6 at 11-17.) The defendants respond that there are no serious questions because determining medical necessity would require "hundreds, if not thousands" of patient-specific determinations, and the plaintiffs have not alleged any evidence of the kickbacks necessary to establish fraud. (ECF No. 34-16 at 26-31.)[14]

---

[13] The defendants appear to argue that procedures available in arbitration for No-Fault cases eliminate the possibility of irreparable harm. (*See* ECF No. 34-16 at 24-26 (explaining that the arbitration program "affords more robust options for parties presenting with more complicated No-Fault disputes" and that the plaintiffs "would prefer to litigate [in federal court] does not mean that it will suffer irreparable harm").) But as the Second Circuit and other courts in this district have observed, New York's arbitration process for no-fault coverage is "an expedited, simplified affair," in which "[d]iscovery is limited or non-existent." *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 99 (2d Cir. 2014) (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-4.5). The process is "meant to work as quickly and efficiently as possible;" on the other hand, "[c]omplex fraud and RICO claims, maturing years after the initial claimants were fully reimbursed, cannot be shoehorned into this system." *Id.*; *accord Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *2; *Mayzenberg*, 2018 WL 6031156, at *6. Accordingly, "the claims brought in this action cannot be meaningfully pursued in no-fault insurance proceedings." *Beynin*, 2021 WL 1146051, at *6 (citing *Parisien*, 352 F. Supp. 3d at 229 and *Mayzenberg*, 2018 WL 6031156, at *4).

[14] The defendants contend that they cannot be held liable without the allegations of kickbacks. (*See* ECF No. 34-16 at 10 ("Each theory depends on the non-specific allegations of kickbacks, as otherwise, SMK is simply filling prescriptions.")). But New York law provides that downstream providers may be held liable for medically unnecessary services under the state's No-Fault insurance laws. *See Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *7 ("New York law provides that defendants may be held liable for medically unnecessary services under New York's No-Fault insurance laws." (citing *Long Is. Radiology v. Allstate Ins. Co.*, 36 A.D.3d 763, 764 (2d Dep't 2007))); *see also Wellmart RX*, 435 F. Supp. 3d at 453-54 (issuing a preliminary injunction against a pharmacy involved a No-Fault insurance fraud scheme that used topical compound pain creams, and finding that "GEICO easily meets the threshold of showing a serious question going to the merits" based on a detailed complaint supported by specific examples, exhibits and other documentation). Moreover, the complaint alleges that the pharmacy did more than fill prescriptions; it targeted expensive products and distributed stamps with the DCTLM cream's formulation to a network of colluding providers.

At this early stage in a case,[15] district courts in this circuit generally "look to whether there is a serious question going to the merits to make them a fair ground for trial," *Relief Med.*, 2021 WL 3565739, at *9 (collecting cases), because "because any likelihood of success inquiry would be premature." *Id.* (quoting *Zaitsev*, 2021 WL 3173171, at *1). "The 'serious questions' standard permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). "The value of an approach encompassing the serious questions standard 'lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'" *Beynin*, 2021 WL 1146051, at *6 (quoting *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35).[16]

The plaintiffs seek, among other relief, a declaratory judgment that the defendants have no right to receive payment for any pending bills they submitted to the plaintiffs. (ECF No. 1.) Their complaint alleges that the defendants billed for services that were "medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care." (*Id.* ¶ 249.) As described above, the complaint "detail[s] a complicated scheme of alleged fraudulent activity,"

---

[15] There is a pending motion to dismiss the action, and parties appear to have begun limited discovery. (*See* ECF No. 34-16 at 8 (asserting that the defendants produced the pharmacy's financial records to the plaintiffs).)

[16] The defendants argue that because the plaintiffs filed their motion for a preliminary injunction after the parties briefed a motion to dismiss, a different test—the pleading standards under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)—should be used. The defendants cite no authority for this position. *Iqbal* addresses pleading standards, not the standards for issuing a preliminary injunction. *Id.*

*Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 222 (E.D.N.Y. 2013), supported by specific examples and exhibits. For example, the complaint identifies the products involved in the alleged scheme—compound cream, diclofenac sodium and lidocaine—and explains why they were medically unnecessary for the insureds, who had minor soft tissue injuries from motor vehicle "fender-benders." The complaint details the way the defendants carried out their scheme, in part by providing rubber stamps to prescribing providers and submitting fraudulent forms to the plaintiffs, and includes examples to support the allegations. The plaintiffs also provide a deposition from a physician who reviewed 50 claims, and supports the plaintiffs' allegations.

The record as a whole—including the complaint's detailed allegations and exhibits, along with the physicians' declarations and underlying treatment records—establishes, at a minimum, a serious question going to the merits as to whether the defendants dispensed medically necessary products.[17] *See Parisien*, 352 F. Supp. 3d at 229 ("Facially legitimate treatments may be provided with little variance across multiple patients, but it is only by analyzing the claims as a whole that the irresistible inference arises that the treatments are not being provided on the basis of medical necessity."); *see also Cean*, 2019 WL 6253804, at *5 (finding a serious question

---

[17] The defendants argue that the plaintiffs did not plead fraud with sufficient particularity, as required under Federal Rule of Civil Procedure 9(b). (ECF No. 34-16 at 30-31.) A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is to "(1) provid[e] a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protect[ ] a defendant from harm to his reputation or goodwill; and (3) reduc[e] the number of strike suits." *DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Under this heightened pleading standard, a plaintiff alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197-98 (2d Cir. 2013) (citations omitted). The plaintiffs have pleaded fraud with particularity, detailing the alleged insurance fraud scheme, its participants and its products, and providing numerous examples, including specific claim numbers at issue, to support their allegations; these together provide the defendants "fair notice . . . to enable preparation of [their] defense." *DiVittorio*, 822 F.2d at 1247.

going to the merits where plaintiffs "alleged, in significant detail, facts relating to Defendants' fraudulent activity in its Complaint, describing fraudulent medical treatment, deceitful billing protocols, and an illegal kickback and referral scheme"); *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *6 (finding a serious question going to the merits where the plaintiffs sought a declaratory judgment that the plaintiffs have "no right to receive payment for over $8.8 million in pending claims . . . because, *inter alia*, the billed-for services were 'medically unnecessary and were provided—to the extent that they were provided at all—pursuant to pre-determined fraudulent protocols designed to financially enrich the [d]efendants'" and the complaint detailed "'a complicated scheme of alleged fraudulent activity,' supported by specific examples and exhibits" (quoting *Elzanaty*, 929 F. Supp. 2d at 222)).[18]

## III. Balance of Hardships

The plaintiffs argue that the balance of hardships tips in their favor because it is more efficient to litigate the defendants' eligibility to collect reimbursement in one forum, rather than on a piecemeal basis, and that the defendants would suffer no hardship from a temporary stay and injunction. (ECF No. 30-1 at 24-25; ECF No. 36-6 at 18-19.) The defendants respond that the facts supporting each of their claims are unique and best addressed through arbitration, and

[18] As support for their challenge to the plaintiffs' claim of lack of medical necessity, the defendants submit the declaration of another physician, who states that he prescribes topical medications from the defendants' pharmacy, including creams, diclofenac sodium products and lidocaine, for bona fide medical reasons. (ECF No. 34-3 ¶¶ 14-18, 22-23, 26-28.) While the declaration answers some of the plaintiffs' allegations, it does not "negate the serious questions raised by the pleadings because [it] largely speak[s] in generalities and do[es] not dispute the patient-by-patient examples" noted above. *Beynin*, 2021 WL 1146051, at *7 (internal alterations omitted). Citing a District of Maryland case, the defendants argue that the plaintiffs' case rests on a "statistical theory" where the insureds live. (ECF No. 34-16 at 30 (citing *State Farm Mutual Ins. Co. v. Carefree Land Chiropractic*, 2018 WL 6514797, at *3 (D. Md. Dec. 11, 2018).) The plaintiffs' allegation that "only 18% of Insureds live anywhere in Queens County" is only one argument that the plaintiffs make to establish lack of medical necessity (ECF No. 1 ¶ 63), and at this early stage in the case, I decline to address the value of statistical evidence.

that a temporary stay and injunction would irreparably harm their business. (ECF No. 34-16 at 31-33.)[19]

If the Court grants the plaintiffs' motion to enjoin the underlying collection proceedings and the plaintiffs do not prove their claims, "at worst, [the defendants'] recovery of the no-fault benefits to which they are entitled will be delayed; all [the defendants] can hope for in pursuing their parallel state lawsuits and arbitrations is to accelerate their receipt of benefits to which they are already entitled." *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *8. On the other hand, if the defendants' pending collection actions are not stayed, as discussed above, the plaintiffs will suffer irreparable harm. *Id.* Accordingly, the balance of hardships tips in the plaintiffs' favor.

Moreover, the defendants "will suffer no prejudice if their right to collect the pending billing is adjudicated in a single declaratory judgment action." *Id.* "Indeed, granting the stay and injunction will actually save all parties time and resources. Rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action." *Cean*, 2019 WL 6253804, at *5 (citing *Elzanaty*, 929 F. Supp. 2d at 222 (finding that "all parties will benefit from having the issue of fraudulent incorporation determined in one action")). Like the defendants in similar actions, the defendants here "will benefit from the stay if [they] ultimately prevail[ ] in this matter because [they] will be entitled to the collection of interest at a rate of two percent every month that the No-Fault payments are overdue." *Gov't Emps. Ins. Co. v. Strutsovskiy*, No. 12-CV-330, 2017

[19] The defendants also argue that the plaintiffs will not suffer any financial harm because they are subsidiaries of a large company and can "recoup any payments" from conflicting rulings if they are "ultimately successful" in this case. (ECF No. 34-16 at 31-32.) But as discussed here and above, the plaintiffs' concerns about conflicting rulings have nothing to do with financial harm. (ECF Nos. 30-1 and 36-6.)

WL 4837584, at *8 (W.D.N.Y. Oct. 26, 2017) (quoting *Elzanaty*, 929 F. Supp. 2d at 222); *see also* N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.9(a) ("All overdue mandatory and additional personal injury protection benefits due an applicant or assignee shall bear interest at a rate of two percent per month, calculated on a pro-rata basis using a 30-day month.").[20]

**IV. Bond**

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "an exception to the bond requirement has been crafted for cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'" *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *8 (quoting *Pharm. Soc. of State of N.Y., Inc. v. N.Y. State Dept. of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995)).

Although the plaintiffs do not bring claims under a federal health or welfare statute, New York's No-Fault insurance statutes are "designed to protect accident victims regardless of fault by enabling them to obtain necessary medical attention without concern of the ability to pay. *Id.* (quoting *Mayzenberg*, 2018 WL 6031156, at *10). Courts in this district have waived Rule 65(c)'s security requirement in cases that allege fraudulent schemes involving New York's No-Fault insurance statutes and a lack of prejudice to defendants resulting from a preliminary injunction. *See, e.g.*, *Beynin*, 2021 WL 1146051 at *10; *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *8; *Mayzenberg*, 2018 WL 6031156, at *10. The same considerations justify waiving the bond requirement here.

---

[20] The defendants claim that they will suffer because they will not be able to collect interest on future claims that they would be enjoined from pursuing. (ECF No. 34-16 at 33.) Accepting this reasoning would require the Court not only to assume the existence of hypothetical claims, but also to assume that the defendants would prevail on these.

## CONCLUSION

As explained above, the plaintiffs' motion is granted. Until this action is resolved, all No-Fault insurance collection arbitrations between SMK Pharmacy and the plaintiffs pending before the American Arbitration Association are stayed, and the defendants are enjoined from commencing any new No-Fault insurance collection arbitrations or state court collection lawsuits against the plaintiffs on behalf of SMK Pharmacy.[21]

**SO ORDERED.**

s/Ann M. Donnelly
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
February 23, 2022

[21] Because the plaintiffs do not seek to enjoin ongoing state proceedings (ECF No. 36-6 at 20), I do not address the defendants' arguments about the Anti-Injunction Act. (ECF No. 34-16 at 33-35.)